Pages 1 - 62

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE:  SOCIAL MEDIA )
ADOLESCENT ADDICTION/PERSONAL )
INJURY PRODUCTS LIABILITY )
LITIGATION, )
) **NO. C 22-md-03047-YGR (PHK)**
)
_____)

San Francisco, California
Thursday, December 14, 2023


**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

For Plaintiffs:
                    SEEGER WEISS LLP
                    1515 Market Street - Suite 1380
                    Philadelphia, Pennsylvania  19102
               BY:  **CHRISTOPHER SEEGER, ATTORNEY AT LAW**
                    **CHRISTOPHER AYERS, ATTORNEY AT LAW**

                    LIEFF, CABRASER, HEIMANN
                       & BERNSTEIN LLP
                    275 Battery Street - 29th Floor
                    San Francisco, California 94111
               BY:  **LEXI J. HAZAM, ATTORNEY AT LAW**

                    MOTLEY RICE LLC
                    401 9th Street NW - Suite 630
                    Washington, D.C. 20004
               BY:  **PREVIN WARREN, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

**APPEARANCES**:   **(CONTINUED)**

For Plaintiff State of Colorado:
          COLORADO DEPARTMENT OF LAW
          1300 Broadway - 6th floor
          Denver, Colorado 80203
       BY:   **BIANCA MIYATA, SENIOR ASSISTANT**
          **ATTORNEY GENERAL**

For Plaintiff State of California:
          CALIFORNIA DEPARTMENT OF JUSTICE
          455 Golden Gate Avenue - 11th Floor
          San Francisco, California 94102
       BY:   **MEGAN O'NEILL, DEPUTY ATTORNEY**
          **GENERAL**

For Plaintiff Commonwealth of Kentucky:
          KENTUCKY OFFICE OF THE
          ATTORNEY GENERAL
          Office of Consumer Protection
          1024 Capital Center Drive - Suite 200
          Frankfort, Kentucky 40601
       BY:   **CHRISTIAN LEWIS, COMMISSIONER**

For Defendant Meta:
          COVINGTON & BURLING LLP
          1999 Avenue of the Stars - Suite 3500
          Los Angeles, California 90025
       BY:   **ASHLEY M. SIMONSEN, ATTORNEY AT LAW**

          COVINGTON & BURLING LLP
          620 Eighth Ave
          New York, New York 10018
       BY:   **GREGORY L. HALPERIN, ATTORNEY AT LAW**

          COVINGTON & BURLING LLP
          Sales Force Tower
          415 Mission Street - Suite 5400
       BY:   **ISAAC D. CHAPUT, ATTORNEY AT LAW**

     **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

1  **<u>APPEARANCES</u>:   (CONTINUED)**

2  For Defendant Meta:

                         COVINGTON & BURLING LLP
3                        One City Center
                         850 Tenth Street, NW
4                        Washington, D.C.  20001
                   BY:   **PAUL W. SCHMIDT, ATTORNEY AT LAW**
5                        (Appearing remotely via Zoom.)

6  For Defendant Snap:

                         MUNGER, TOLLES & OLSON LLP
7                        560 Mission Street - 27th Floor
                         San Francisco, California  94105
8                  BY:   **JONATHAN H. BLAVIN, ATTORNEY AT LAW**

9                        MUNGER, TOLLES & OLSON LLP
                         355 South Grand Avenue - 35th Floor
10                       Los Angeles, California 90071
                   BY:   **ROSE L. EHLER, ATTORNEY AT LAW**
11                       **LAURA M. LOPEZ, ATTORNEY AT LAW**
                         (Appearing remotely via Zoom)
12
                         MORGAN, LEWIS & BOCKIUS LLP
13                       1111 Pennsylvania Avenue, NW
                         Washington, D.C.  20004
14                 BY:   **STEPHANIE B. SCHUSTER, ATTORNEY AT LAW**
                         (Appearing remotely via Zoom)
15
   For Defendant TikTok:
16                       FAEGRE DRINKER BIDDLE & REATH LLP
                         300 North Meridian Street - Suite 2500
17                       Indianapolis, Indiana 46204
                   BY:   **ANDREA PIERSON, ATTORNEY AT LAW**
18
   For Defendant YouTube:
19                       WILSON, SONSINI, GOODRICH & ROSATI
                         633 West Fifth Street - 15th Floor
20                       Los Angeles, California 90071
                   BY:   **CHRISTOPHER CHIOU, ATTORNEY AT LAW**
21

22       (APPEARANCES CONTINUED ON FOLLOWING PAGE)

23

24

25

**<u>APPEARANCES</u>:   (CONTINUED)**

For Defendant YouTube:

                              WILSON, SONSINI, GOODRICH & ROSATI
                              650 Page Mill Road
                              Palo Alto, California 94304
                    BY:   **ANDREW KRAMER, ATTORNEY AT LAW**

                              MORGAN, LEWIS AND BOCKIUS, LLP
                              600 Brickell Avenue - Suite 1600
                              Miami, Florida 33131
                     BY:   **BRIAN M. ERCOLE, ATTORNEY AT LAW**
                              (Appearing remotely via Zoom.)

1  <u>**Thursday - December 13, 2023**</u>                                    <u>**1:11 p.m.**</u>

2                          P R O C E E D I N G S

3                              ---o0o---

4        **THE CLERK:**  Please remain seated.  Come to order, the

5  Honorable Peter H. Kang presiding.

6                      (Pause in proceedings.)

7        **THE COURT:**  Good afternoon.

8        **ALL:**  Good afternoon, Your Honor.

9        **THE COURT:**  Great.  Call the case.

10        **THE CLERK:**  Now calling 22-MD-3047, In Re: Social

11  Media Adolescent/Addiction Personal Injury Products Liability

12  Litigation.

13        **THE COURT:**  All right.  We are here for our very first

14  discovery management conference before me.  And I thank the

15  parties for submitting the updated agenda for today because

16  we've got folks on Zoom, and the court reporter is here.

17  Anybody who's going to speak, please identify yourself for the

18  record before speaking.  And I assume, given the number of

19  issues, it's going be to be more than one person per side

20  talking.

21      So before we get into the specifics of your agenda --

22  first of all, I hope you all saw the docket entry where my plan

23  is to hold a discovery management conference either the day

24  before or day after every monthly CMC you have with Judge

25  Gonzalez Rogers.  That way we minimize travel and we take

**PROCEEDINGS**

1  advantage of the efficiencies there.

2      Since she set her CMCs at least through March, I have set

3  mine correspondingly, and you can expect that going forward.

4      I think it was pretty clear, the Friday before each

5  discovery conference, I just need a status report.  The details

6  are there, but essentially, I need to know how things are

7  going, what are the disputes that are ripe for disposition; and

8  then, if there's something going on in the JCCP that I need to

9  know about that affects things here, a heads-up on that.

10      And kind of a more horizon-looking heads-up on issues that

11  may or may not be brewing or may or may not be a dispute in the

12  future, but it's something you think I need to know about just

13  as a heads-up that's coming down the pike.

14      And then, obviously, at the monthly conferences, my strong

15  preference is for the counsel who are specifically

16  knowledgeable of the specific issue to be present here.  That

17  way, we have a better dialogue -- just because it's hard to do

18  things with a ton of people on Zoom; but I understand the

19  travel is sometimes an issue.

20      All right.  As a general matter, my understanding from

21  speaking with Judge Kuhl, and from other indications, is that

22  both Judge Kuhl and Judge Gonzalez Rogers and myself have --

23  are coordinating.  We've kind of -- you've gotten indications

24  from her that discovery should essentially be managed here

25  going forward with -- if there are specific issues that are

1    specific only to the JCCP, you can raise them with her; but as

2    an initial matter, you're stuck with me, unfortunately.

3        And therefore, as a general matter, I know you've

4    withdrawn the many disputes over the coordination order -- the

5    proposed coordination order, but indicated you're going to

6    continue working on coordinating.

7        I'm just letting you know, given her indications on

8    preference and our preferences, obviously, just as a

9    philosophical overarching approach, nobody wants duplicative

10   discovery in the different courts.  We expect the parties to

11   work out reasonable agreements so that discovery taken in the

12   MDL would be applicable in the JCCP and vice versa; right?

13       And obviously, understanding there may be specific

14   plaintiffs with specific causes of action or only specific

15   defendants in a specific case, that may warrant some separating

16   out of what discovery is applicable in a specific individual

17   case.

18       But my expectation is that reasonable counsel can come to

19   agreements on that because it should be fairly obvious which

20   defendant has produced which discovery and, therefore, which

21   defendant's discovery is applicable if it's only that defendant

22   in a particular individual case, for example, the JCCP.

23       But the goal here is to make sure this is as streamlined

24   and easy as possible, and that's kind of the general approach I

25   expect the parties to make -- to take.

1          All right.  So let's get into a little more detail.  My

2     understanding -- has Judge Kuhl signed off on the plaintiff

3     fact sheet order yet?  Has she issued that?

4          **MS. HAZAM:**  Lexi Hazam for plaintiffs.

5          Your Honor, Judge Kuhl has not yet signed off on those

6     orders.  It's the plaintiff fact sheet and accompanying orders.

7     She has now resolved all disputes regarding them, and they have

8     been submitted to her in their final form for execution.

9          Once they are entered by her, we do anticipate presenting

10    the same orders to Judge Gonzalez Rogers for entry or to

11    Your Honor if that's the Court's preference.  We told

12    Judge Gonzalez Rogers the same yesterday.

13         **THE COURT:**  Okay.  Whether it's Judge Gonzalez Rogers

14    or myself, I don't -- I leave it up to you to figure out who's

15    the better person.  Obviously, the goal would be to make sure

16    that those fact sheets have the same force and effect as if

17    they're written discovery in this action.  So you'll need the

18    order here, and I can sign or she can sign and kind of figure

19    out what the best procedural approach there is.

20         And then my understanding is that the next stage is to

21    work out plaintiffs' fact sheets.  Is that about -- defendants'

22    fact sheets?  Is that underway, or is that not started yet?

23         **MS. HAZAM:**  It is underway, Your Honor.  The

24    plaintiffs have proposed a draft defendants' fact sheet to

25    defendants, and I believe that meet and confer will be underway

**PROCEEDINGS**

1   shortly if it has not already.  So that next stage has begun.

2          **THE COURT:**  Okay.  So my suggestion is, we follow the

3   same general process you've done which is:  Work it out amongst

4   yourselves; get an order signed off by Judge Kuhl; and then

5   come to us here in this court; and we'll follow the same

6   procedure to make sure it all gets worked out equally there.

7          Just keep me apprised of the status and make sure, if

8   there are issues I need to know, put that in the monthly status

9   reports if you think it will extend past January.

10         Do you think it will?

11         **MR. CHAPUT:**  Your Honor, Isaac Chaput on behalf of the

12  Meta defendants.

13         We currently expect to submit our objections to the

14  plaintiffs' proposed defendant fact sheet next week, and the

15  parties are going to continue meeting and conferring.  I don't

16  think that we have a -- we don't have an anticipated date for

17  when it's going to be finalized, but we are anticipating

18  submitting initial disputes to Judge Kuhl in the early part of

19  January.

20         **THE COURT:**  Okay.  Then just keep me apprised on the

21  status of that.

22         Does -- because I haven't seen -- getting access to the

23  state court docket is a challenge from here.  So I haven't seen

24  whether -- is there an order or in your fact sheet proposal, is

25  there a procedure already laid out for challenges to whether a

1  fact sheet was filled out sufficiently and that kind of thing?

2  Or is that going to be handed separately?

3      **MR. HALPERIN:**  Your Honor, Greg Halperin for the Meta

4  defendants.

5      We proposed that process to Judge Kuhl initially.  Her

6  preference was to deal with those as they arise, depending on

7  the specific alleged deficiencies, so the proposed order stops

8  much earlier in the process before disputes will be resolved by

9  the Court.

10      **THE COURT:**  Okay.  Hopefully, there won't be a lot of

11  disputes and you'll be able to work those out, but obviously

12  that seems to make sense.

13      All right.  While we're talking about meeting and

14  conferring, my understanding is, both in the JCCP and I know in

15  this Court, obviously, we're still working on motions to

16  dismiss and whatnot, but I don't believe I've seen either

17  proposals from the parties and I certainly haven't seen any

18  orders from any of the judges setting even kind of tentative

19  target dates for completing fact discovery.

20      Is that correct?

21      **MS. HAZAM:**  Lexi Hazam for plaintiffs.

22      That is correct, Your Honor.

23      **THE COURT:**  All right.  So because I want to make sure

24  the process is moving forward, and that we're all working

25  towards a goal here to get these cases to completion, what I'd

**PROCEEDINGS**

 1  like to do is -- I'm ordering the parties to start meeting and

 2  conferring promptly now, and going forward, and no later than

 3  our next DMC, but even if you can do it sooner, that's fine.

 4      Meet and confer, come up with some, hopefully, agreed-upon

 5  proposed target dates for completing fact and expert discovery.

 6      And what the -- and, really, I don't think I've seen a

 7  discovery plan beyond the fact sheets discussed either, so

 8  proposals for a discovery plan consistent with Rule 16 and

 9  Rule 26 just to give me some sense of how much discovery is

10  going to be, given there's, as I understand -- a lot of

11  information has been obtained through the investigation process

12  and all that, so I don't have a good sense yet, from the

13  parties, of what -- how much more discovery is actually going

14  to be needed.  And so it would help, I think, to set some

15  target dates for completing all the discovery and some --

16  you know, trying to reach a consensus.

17      And if you can't agree, then I'll issue an order on kind

18  of how to approach discovery and getting a discovery plan in

19  place so that you all know what you're -- what you're aiming

20  for.

21      I assume -- you know, it's next month.  That should be

22  plenty of time to meet and confer on this stuff, but let me

23  know if you need more time.

24      Does anybody think they need more time?

25          **MS. SIMONSEN:**  Ashley Simonsen for the Meta

1    defendants.

2        I did want to flag for Your Honor that the defendants

3    have, in the MDL, proposed to Judge Gonzalez Rogers that we

4    essentially do -- we staged the issue of general causation

5    earlier in the case.

6        The parties are exchanging simultaneous briefing on that

7    issue by January 15th, with rebuttal, two-page letters, a

8    couple of days later.  Judge Gonzalez Rogers has indicated she

9    will try to hear argument on that issue at the January

10   conference, but may not rule until February.

11       That particular issue, if it is staged early, may affect

12   the way that discovery -- a discovery plan would -- would fall

13   out.  And so I did just want to raise that for Your Honor.  I

14   don't think it presents any obstacle to negotiating with

15   plaintiffs about a potential discovery plan.

16       I think, on the defendants' side, I just want you to be

17   aware that we will likely be proposing, as part of that

18   discovery plan, an early stage to address general causation.

19       THE COURT:  That's fine.  You can -- if you want, you

20   could even propose alternative discovery plans if she denies or

21   grants the staging, if you want.

22       MS. HAZAM:  And, Your Honor, from plaintiffs'

23   perspective, we're happy to start the meet and confer process

24   now.  We don't believe that the briefing that will be submitted

25   on the issue that Ms. Simonsen identified should interfere with

 1    that.

 2        We would note that defendants have taken the position, as

 3    we understand it, that discovery -- they are not seeking to

 4    bifurcate discovery such that any particular liability

 5    discovery could not proceed.  Their request is more for a

 6    prioritization of resolution of a particular issue; and so we

 7    believe that the meet and confer that Your Honor just referred

 8    to should, in fact, begin and we will be happy to undertake it

 9    with defendants.

10        **THE COURT:**  Okay.  Good.

11        And as I take it from both sides, the general idea of

12    setting target dates doesn't really get changed.  I mean, the

13    target date for finishing discovery is going to be whatever it

14    is, regardless of whether discovery is phased or prioritized in

15    some way by subject matter.

16        Is that correct?

17        **MS. SIMONSEN:**  That's correct, Your Honor.

18        Ashley Simonsen for the Meta defendants.

19        I would simply flag that the general causation staging --

20    Ms. Hazam is right; we haven't proposed to bifurcate discovery.

21    But to the extent there is discovery bearing on that issue, any

22    discovery plan may prioritize that issue in discovery as well.

23        **THE COURT:**  All right.  Okay.

24        So you can include your proposals in the status report in

25    January, or if you want to do it as a separate filing,

 1   depending on volume, to figure out -- just present it to me in

 2   a way that makes sane.

 3        Okay.  Oh, assume everyone has -- I mean, if they don't,

 4   not every provision applies.  But I assume everyone has at

 5   least glanced at or read my standing order on discovery and

 6   understands my general approach to discovery disputes.

 7        Okay.  So I guess next is the specifics of the proposed

 8   agenda from the parties.  And the first issue is the -- your

 9   update regarding preservation order negotiations.

10        Who's going to speak to that?

11        **MR. WARREN:**  Your Honor, Previn Warren for the

12   plaintiffs.  This should be very quick.

13        The parties did engage in very extensive meeting and

14   conferring over the course of many months, and mutually came to

15   the conclusion that we were not able to reach agreement and

16   that it was -- given that discovery has now opened, the project

17   of reaching an agreed upon preservation order seemed largely

18   moot, and so we've abandoned that effort in favor of the

19   default that ordinarily applies under the Federal Rules.

20        **THE COURT:**  Okay.

21        **MR. CHAPUT:**  Isaac Chaput for the Meta defendants,

22   Your Honor.

23        We agree with that.  The parties have agreed to set aside

24   the preservation order that we had been discussing.  I would

25   just flag, as was reflected in the parties' submission, there

 1    are areas where defendants may wish to continue meeting and

 2    conferring to see if we can agree to some narrower, more

 3    targeted orders on particular issues, similar to the CSAM

 4    preservation order that Your Honor has already ordered.

 5         **THE COURT:**  Okay.  All right.  Good.

 6         And next -- unless there's more on the preservation order?

 7    Okay.

 8         Next is the Snap account deletion issue.  Who's going to

 9    speak to that?

10         **MR. WARREN:**  Thank you, Your Honor.  Previn Warren,

11    again, for the plaintiffs.

12         So this is --

13         **MS. EHLER:**  Good afternoon, Your Honor.  Rose Ehler

14    for Snap on video.  I apologize for not being there in the

15    courtroom today.

16         **THE COURT:**  Okay.

17         **MR. WARREN:**  Sorry, in advance, for any crosstalk that

18    might have occurred from the hybrid nature of this.  The Zoom

19    screen --

20         **THE CLERK:**  Is the Zoom screen there?

21         **MR. WARREN:**  We can -- I can see it from where I'm

22    sitting.  Yeah.

23         **THE COURT:**  There's a larger screen over here, over

24    your shoulder.

25         **MR. WARREN:**  Okay.  So, Your Honor, this issue arises

1    from what I think is an undisputed fact, that Snap has

2    permanently deactivated and purged 262 plaintiff accounts.

3        That was brought to our attention by Snap's counsel right

4    around Thanksgiving.  From what I understand, Snap's counsel

5    brought it to our attention promptly after they learned of it,

6    so they should be credited for that.

7        Of course, the plaintiffs are very concerned about whether

8    any information was permanently destroyed and has not been

9    preserved in some other form.

10       What we've asked Snap to do is permit us to obtain

11   discovery into that discrete issue -- which we take the

12   position we could do anyway since discovery is open.  But we

13   want an early 30(b)(6) deposition on that topic and, you know,

14   we've asked for a very discrete set of documents to accompany

15   that to inform our examination of the witness.

16       We've tried to be very targeted in our request here.  We

17   have eight deposition topics and three document requests, one

18   of which is just the witness' CV, one of which is the documents

19   that the witness reviewed and relied on, and the last of which

20   is documents sufficient to show the data elements that Snap

21   collects for any given Snap user account.  We need to

22   understand what that universe looks like in order for us to

23   assess what has been destroyed and what remains.

24       I believe we've reached agreement on the concept of a

25   30(b)(6) deposition to be taken sometime in January.  I also

1  believe we've reached, largely, agreement on the topics.  I did

2  have a meet and confer with Snap's counsel last night in which

3  I offered clarification on some of the topics; they asked some

4  questions.  I'm under the understanding they plan to, you know,

5  assert some objections, many of which are standard objections,

6  like privilege.

7      There are two remaining disputes here -- which maybe only

8  remain disputes because we, you know, didn't have the benefit

9  of meeting and conferring further before showing up today, but

10 I'll flag them for Your Honor in case you have guidance on

11 this -- one of which is the length of the deposition.

12     Snap has indicated that they will need to field two

13 witnesses to cover the eight topics.  Under the default, that

14 would entitle us to 14 hours, seven per witness.  They have

15 asked for just seven hours across both witnesses.  And we've

16 come back in the middle at 11 hours.  That does not seem

17 acceptable to Snap.  We think it's fair to split the

18 difference.  And we've made movement from what it should be.

19 That's Dispute 1.

20     Dispute 2 is over the request over documents sufficient to

21 show the data that exists with respect to Snap user contents.

22     Snap's counsel, on a meet-and-confer very recently, seems

23 to have taken the position that they can't actually provide

24 those documents.  I don't know if that's right or not -- and

25 I'll let Snap's counsel address that -- but we see that as an

1  essential predicate for us taking this deposition, for the

2  reasons I've explained.

3      We've tried, again, to be very targeted here, you know,

4  notwithstanding the level of concern that we really have over

5  how prejudicial this data destruction could be, and have

6  endeavored to meet and confer to resolve the issue.

7      But those are two outstanding disputes about it.

8          **MS. EHLER:**  Your Honor, I'll respond.  I apologize.  I

9  can't see you, so --

10         **THE COURT:**  I'm not on camera --

11         **MS. EHLER:**  -- if that's okay.

12         **THE COURT:**  -- but I can see you.

13     So go ahead, Ms. Ehler.

14         **MS. EHLER:**  Sure.  Let me just start with a little bit

15  more information so that you're caught up to speed on this

16  issue, and then I'll address what Mr. Warren --

17     This is Ms. Ehler for Snap, for the court reporter.

18     I'll address the two disputes, which I hope are actually

19  resolved.

20     As Mr. Warren indicated, we are meeting and conferring --

21  including directly before Mr. Warren entered court, I sent him

22  an e-mail, which I don't think he's seen yet.

23     On the background, I want to start with the fact that Snap

24  and we are all taking this very seriously.  We absolutely did

25  raise it promptly.  We are being as forthcoming as we're able,

**PROCEEDINGS**

 1   as we're learning information with the understanding that,

 2   you know, we are trying to be forthcoming in prioritizing that,

 3   and some of these pieces we're learning as we go.

 4       Based on the information we have and discussing this with

 5   the individuals involved at Snap so far, this really was an

 6   honest mistake.  The individual at Snap who's responsible for

 7   locking the accounts, that person has worked there for years.

 8       The locks had never before this point in time resulted in

 9   any deletion of the accounts.  Due to a different change on a

10   different team of certain automatic deletion features,

11   unfortunately, the subset -- I believe it's only 28 plaintiffs

12   in the MDL, more in the JCCP, but a subset of accounts was

13   inadvertently deleted before it was realized that this -- that

14   this was happening -- just so you know.

15       What we're now doing to confirm that there wasn't data

16   lost is we're working from a couple of data sources.  One is

17   there are account preservation snapshots for each of these

18   accounts.  Those exist.  They've been preserved.  They haven't

19   been impacted.  We're working to ensure that that data maps

20   onto any data that the account user would be able to access

21   through their account.

22       The accounts were locked so there was no new data created,

23   so there's -- it's not like there was data lost between the

24   preservation and subsequently.

25       And then separately, we are working from the substantial

1   amount of information that the plaintiffs are seeking in the

2   defendants' fact sheet, we're working from that document to try

3   to ensure that the other -- all of the other databases that

4   have been preserved have that data and can answer those

5   questions for plaintiffs.  And thus far, we have no indication

6   that there's data lost across those sources.

7        So that's what we're actively doing.

8        Mr. Warren is correct, we have agreed to an early

9   30(b)(6), outside of sort of the normal course of a complete

10  topics list; and we are working to make sure we have all of the

11  information we need so that that person -- or those people can

12  be prepared for that.

13       On the two disputes, when Mr. Warren and I spoke earlier

14  this afternoon, he said that they wanted to do 10 hours between

15  the two witnesses if we offered two witnesses.  I wrote back

16  and said that would okay.  So hopefully that's not an ongoing

17  dispute.

18       And on the second issue -- again, I recognize Mr. Warren

19  hasn't seen his e-mail, but we are willing and will provide

20  those documents that we have that show all of the user account

21  data fields.

22       And to the extent there are -- we only know -- we don't --

23  we don't know about all of the documents.  To the extent that

24  there are sources that are not covered by the documents we

25  have, we will work to prepare a witness to identify and speak

1    at a general level regarding those gaps.

2        So I think that -- at least from my sense, that's the best

3    we can do given the information that's available and hope that

4    works.

5        **MR. WARREN:**  Your Honor, Previn Warren for the

6    plaintiffs.

7        Ms. Ehler's right; I had not seen her e-mail before

8    walking in here.  Ten hours is perfectly fine, so that's

9    resolved.  And I'm encouraged to hear that they'll be

10   responding to that document request.

11       **THE COURT:**  Great.  Well, thank you for working

12   through that and meeting and conferring in realtime before me.

13                       (Laughter.)

14       **THE COURT:**  Maybe I should take credit for --

15       **MS. EHLER:**  And virtually.  Sorry.

16       **THE COURT:**  -- credit for that as a motion that I've

17   resolved.  Okay.  Great.

18       Then the next issue is the protective order dispute.

19       So, first, procedurally, who's going to speak to that?

20       **MS. HAZAM:**  Your Honor, Lexi Hazam for plaintiffs.

21       The individual plaintiffs and the school districts, but we

22   also have --

23       **MS. MIYATA:**  Good afternoon, Your Honor.  Apologies

24   for the musical chairs.  Bianca Miyata on behalf of the state

25   plaintiffs.

1          **MS. SIMONSEN:**  Ashley Simonsen for the Meta defendants

2     on behalf of the defendants.

3          **THE COURT:**  So, first, as a matter of federal civil

4     procedure, I cannot rule on an appeal to Judge -- addressed to

5     Judge Gonzalez because I can't -- that's -- that's not how,

6     procedurally, it works.

7          So after discussing with the brain trust here on the

8     details of this little nitpick of federal civil procedure,

9     here's what we want you to do:  Withdraw the appeal -- withdraw

10    all the briefing on that appeal on that protective order

11    issue -- which I think starts at Docket 303, if I remember

12    correctly.  But all the briefing on that should be withdrawn.

13    Then, refile, to me, a motion to amend the protective order.

14         And I don't want new argument, so all you do is -- all I

15    want is a cover sheet that jointly submits a motion to amend

16    the protective order and attaches as appendices, or exhibits to

17    that, all the prior briefing and just incorporates all that by

18    reference -- and that can include the recent statement from the

19    states.

20         Okay.  And I assume nothing has changed in the -- on the

21    record that requires additional briefing at this point because

22    it's been pending for a while.

23         Let me stop there.

24         Does anybody have a good argument why they need to brief

25    this issue even more?

1        **MS. SIMONSEN:**  On behalf of -- go ahead.

2        **MS. HAZAM:**  Not for plaintiffs, Your Honor.

3        **MS. SIMONSEN:**  On behalf of the defendants, no.

4     I would note, Your Honor, of course, that one circumstance

5  that has changed is that there is now an understanding among

6  Judge Kuhl, Judge Gonzalez Rogers, and yourself as to who will

7  principally be handing defensive discovery, which may be

8  relevant insofar as I think it leaves open the question whether

9  Judge Kuhl actually intends to address a protective order in

10  the JCCP, which is one of the main issues that the plaintiffs

11  have raised in this dispute.

12        **THE COURT:**  Well, she's going to do what she's going

13  to do in the JCCP.  All I can do is decide the dispute on the

14  protective order here, and if she wants to modify any terms as

15  they plan her case, she, of course, will do that.

16     Okay.  So how long before you can withdraw and refile all

17  of that to me?  Like next week?  End of this week?

18        **MS. HAZAM:**  I certainly think it could be by early

19  next week, Your Honor.  And if you need it sooner, we can do it

20  sooner.

21        **THE COURT:**  Let's do it by Monday.

22        **MS. SIMONSEN:**  That's no problem for the defendants,

23  Your Honor.

24     May I ask if the Meta defendants could have a short,

25  two-page response to the States' submission, which was made

 1   just yesterday?

 2        THE COURT:  Their submission on the protective was

 3   barely two pages itself.

 4        MS. SIMONSEN:  One page would be -- half a page --

 5        THE COURT:  You need two pages to respond to two

 6   pages?

 7        MS. SIMONSEN:  We would like to point, Your Honor, to

 8   some provisions of the confidentiality agreement that they've

 9   referenced.  We would like to put that in front of Your Honor

10   because it is relevant to their arguments.

11        THE COURT:  Ms. Miyata, any objection to them putting

12   in a one-page response to your filing?

13        MS. MIYATA:  Your Honor, no objection to a one-page

14   response.

15     And, apologies, this is Bianca Miyata for the State

16   plaintiffs.

17        THE COURT:  Okay.  So you get one page.

18        MS. SIMONSEN:  Understood.  Thank you, Your Honor.

19        THE COURT:  Let me just say that I'll issue an order

20   on this, but I don't -- well, I don't have -- so from all of my

21   years in private practice, when parties used similar protective

22   orders in highly contested, multi-defendant multi-party cases,

23   provisions such as Section 7.6 usually don't get objected to.

24     And so I am going to consider the arguments seriously, but

25   just as -- having read the briefing as it stands, I'm -- I'm

**PROCEEDINGS**

1   just saying -- you know, I'll reread it and think harder about

2   it, but I'm going to give you a chance, one last chance to

3   convince me why that needs to be changed, because I'm not that

4   convinced.

5        So if you want to take a shot at some oral argument, you

6   can.

7        **MS. HAZAM:**  I believe the plaintiffs would, Your

8   Honor.  We conferred earlier, and if Your Honor would permit, I

9   think we'd like the state AGs to go first because they've

10  raised some additional arguments that we think are important

11  for framing the discussion.

12       **THE COURT:**  All right.  Very briefly.

13       **MS. MIYATA:**  Bianca Miyata for the state plaintiffs.

14       Your Honor, as you identified, the question today is

15  whether the protective order previously entered by Magistrate

16  Judge Hixson should be modified and whether there's good cause

17  based on harm and prejudice that could result to the parties.

18       The states have operated for over 18 months under a

19  confidentiality agreement with Meta with two critical

20  distinctions from the protection -- protective order that's

21  currently in place here.

22       The first, being that there are no tiered designations for

23  confidentiality, and a single designation encompasses

24  information like trade secrets, financial information, and

25  commercial information.  And second, this agreement has imposed

**PROCEEDINGS**

 1   no particular disclosure or notice requirements.

 2       Meta has raised no reason in their opposition to

 3   plaintiffs' motion, or in our meet and confers, why such an

 4   arrangement would not suffice here.  There's a significant risk

 5   of harm and prejudice to the states if we were to change the

 6   rules of engagement at this point in time.  It could endanger

 7   our ongoing relationships both with expert witnesses,

 8   consultants, former employees with whom we've been --

 9           **THE COURT:**  Let me stop you right there.

10           **MS. MIYATA:**  Yes.

11           **THE COURT:**  The way the protective order works -- and

12   I myself litigated under it for many years.  The way that

13   protective order works, you only need to make those disclosures

14   about experts when you want to start providing to them

15   discovery material designated as highly confidential discovery

16   material in this case.

17       So the timing of the disclosure about your experts to the

18   other side is largely within your control; right?

19       And you make the point about other materials already

20   previously disclosed to some of your so far, non-testifying

21   experts and consultants.  Well, if they already have access to

22   it in a different proceeding or different procedure, that's not

23   discovery produced in this case; right?

24           **MS. MIYATA:**  Understood, Your Honor.  But that does

25   put us in a bit of a quandary because there is a subset of

**PROCEEDINGS**

1   discovery that has been produced from defendants to the

2   plaintiffs that was produced because it was previously produced

3   to the attorney generals.

4        And my understanding is that there was an agreement that

5   all material that was produced from defendants to plaintiffs at

6   this early stage in the game would be designated by agreement

7   as highly confidential, and that agreement was entered into

8   before the state plaintiffs entered this case.

9        So that does leave us in somewhat of a gray area in our

10  ongoing interactions with witnesses, consultants, experts with

11  whom we have previously engaged and will continue to engage

12  should we wish to disclose any of the material that we have

13  received previously from Meta in those productions.

14       **THE COURT:**  So discovery has barely started in this

15  case; right?

16       To the extent you've already done work with experts based

17  on the material you already have from your own investigations

18  from the state investigations, I don't understand why that

19  relationship is at risk at all.  Those experts are still

20  working with you, presumably, and there's nothing in the

21  protective order that requires you to fire them.

22       **MS. MIYATA:**  Certainly not, but if we should continue

23  to provide additional material that is part of the productions

24  from Meta to the states that we have not yet provided to these

25  individuals, we would then, presumably, under the terms of this

1   protective order, now that we are party to the litigation, have

2   an obligation to provide the notice under Provision 7.6 to

3   Meta.  And some of that material is material we had received

4   prior to entry into the litigation and without being subject to

5   the same terms.

6           THE COURT:  Well, let me -- turn to Meta's counsel.

7       If an expert for one of states has already had access to

8   material under the confidentiality agreements entered into with

9   the states, just because it's reproduced here as highly

10  confidential, is it Meta's position that they can no longer

11  access stuff they already had access to?

12          MS. MIYATA:  No, Your Honor.  We're not trying to

13  suggest that the documents have to be taken away from them.

14  Our position is simply that, to the extent they continue to

15  wish to use those experts in connection with this litigation as

16  opposed to in connection with their investigation -- which was

17  what that pre-suit confidentiality agreement pertains to --

18  they would, then, have to disclose to us the extent to which

19  they have disclosed to those experts our highly confidential

20  material.

21      I will note as well, Your Honor, that in that pre-suit

22  confidentiality agreement that Meta entered into with the state

23  attorneys general, it explicitly contemplates that documents

24  that the plaintiffs might seek to use from the investigation in

25  future litigation would be governed by the terms of a

1  protective order entered in the case.

2      So I think it's quite clear, even from that pre-suit

3  confidentiality agreement that the state AGs will be subject to

4  the protective order entered in these proceedings, including as

5  it pertains to expert disclosure provisions.

6      **THE COURT:**  So if the confidentiality agreements

7  contemplated that the -- eventually, the documents would be

8  covered by a protective order, we're at that stage now,

9  Ms. Miyata; correct?

10     **MS. MIYATA:**  Correct, Your Honor.  But I do not

11 believe that it was contemplated that we would be starting from

12 the starting place of the model protective order for trade

13 secrets or what's appropriate to be entered in the patent

14 litigation.  The state's claims here have to do with Meta's

15 business practices, not with their particular trade secrets or

16 anything that would be that kind of proprietary intellectual

17 property.

18     **THE COURT:**  Okay.  So on that point, I would expect

19 Meta to -- I mean, there are multiple tiers of confidentiality

20 and multiple requirements, and I would expect Meta not to

21 default -- as a default, classify everything as the highest

22 level, as highly confidential and outside counsel only; right?

23     And so the disclosure issues and all that, I think, are

24 mitigated to some extent.  And as I said, they're also

25 mitigated by the fact that -- well, it's up to you as to when

**PROCEEDINGS**

1  to start actively working with your experts in this case now as

2  opposed to what the -- relying, at least for the time being, on

3  their work product that you've done in the investigations.

4       And so, to some extent, the timing is still up to you as

5  to when to make the disclosure and start, you know, actively

6  working with the experts.  And the experts are expensive, and

7  it takes time to figure out when to actually get them up to

8  speed.

9       I still don't -- I'm still not convinced it's a burden to

10  identifying, you know, who the experts are and how much they're

11  getting paid and what they're -- handing over their CVs.

12  That's normally done in most complex, you know, litigation

13  involving highly confidential information anyway.

14       **MS. MIYATA:**  And, Your Honor, if I may highlight what

15  I'm hearing back, I think, from Meta's counsel to make sure

16  that I haven't misunderstood.

17       I believe that what Meta is saying -- that while we

18  certainly don't need to take away confidential material that's

19  already been provided, we would then, at this point, be

20  responsible for disclosing the identities of individuals to

21  whom we have disclosed that material up until this point.

22       **THE COURT:**  If you're planning on working with them

23  actively now as opposed -- if you're not actively working with

24  them now on the case, I don't think Meta's position is they

25  need to be disclosed now.  It's when you start actively working

 1  with them on the case.

 2          MS. MIYATA:  Understood.

 3      But that's -- I mean, I think that's an obligation that is

 4  not imposed on any other party or would not be a bilateral

 5  obligation at this point.  It really is something that only

 6  burdens the plaintiffs at this time.

 7          MS. SIMONSEN:  Your Honor, it also burdens defendants

 8  insofar as, for instance, if Meta wishes to share the highly

 9  confidential information of any other defendant with its

10  experts, we, too, would then be required to disclose our

11  experts.

12          MS. MIYATA:  Understood.  But by the definition the

13  Court has put forth, the definition of highly sensitive

14  information and confidential information in this matter

15  wouldn't really apply in the same way to parties such as the

16  state plaintiffs or -- I hesitate to speak for the individual

17  plaintiffs -- but also the sensitive information of individual

18  plaintiffs.  It's purely contemplated from a commercial

19  corporate standpoint.

20          THE COURT:  I -- I'd have to go back -- well, I've got

21  the protective order here.  If an individual's -- any

22  protective material as to -- which includes -- is it the

23  plaintiffs' position that, for example, the medical information

24  of an individual plaintiff is not highly confidential?

25          MS. HAZAM:  Your Honor, in discussions with the --

1    Lexi Hazam for individual school district plaintiffs.

2        In discussions regarding the protective order, plaintiffs

3    have anticipated that the medical and educational information

4    of individual plaintiffs would be deemed confidential.  That is

5    one reason that this is, in our view, a one-sided requirement,

6    because defendants under this order could share such

7    information with their experts without those experts being

8    disclosed to us, whereas the reverse would not apply.

9        And we believe that the individual plaintiffs, children

10   and their parents, here, pose no risk, obviously, of

11   competitive harm to the defendants.  And yet we would be in a

12   position of having to disclose our experts to the other side

13   should we receive any highly confidential information.

14       **THE COURT:**  Does everyone have the protective order

15   section 7.6 in front of them?

16       **MS. HAZAM:**  Yes, Your Honor.

17       **MS. SIMONSEN:**  Yes, Your Honor.

18       **THE COURT:**  "The party that seeks to disclose to an

19   expert as defined in the protective order any protected

20   material."

21       "Any protected material" covers both confidential and

22   highly confidential competitor information.

23       **MS. SIMONSEN:**  This particular provision pertains only

24   to highly confidential competitor information.

25       **MS. HAZAM:**  That's correct, Your Honor.

1    **THE COURT:** Why does it say "any protected material"

2    there, then?

3    **MS. SIMONSEN:** It is under a subheading that indicates

4    that it is talking about procedures for approving or objecting

5    to disclosure of highly confidential competitor. And so I

6    think it's in that context that "protected material" is meant

7    to refer to the highly confidential material.

8    But I would point out, Your Honor, that the definition of

9    highly confidential competitor information is protected

10   material. This is in Section 2.10. "The discloser" -- "the

11   disclosure of which to another party or non-party would create

12   a substantial risk of serious harm that could not be avoided by

13   less restrictive means."

14   And it is, I suppose, theoretically possible that that

15   definition could apply to information plaintiffs may be

16   producing in these cases.

17   But I think it's really beside the point, the fact that a

18   particular disclosure position may not practically be bilateral

19   doesn't mean that the protections that that provision affords

20   should be taken away from the parties that are producing a

21   great deal of highly confidential competitor information.

22   **THE COURT:** I mean, I take that point. I mean, it's

23   often the case that provisions of the protective order impose

24   differing levels of burden on different parties, just simply

25   because of the nature of the parties in the case. Just because

1  the burdens differ doesn't mean that the protections are

2  unwarranted.

3      **MS. HAZAM:**  Your Honor, we are not -- Lexi Hazam for

4  plaintiffs.

5      We are not relying solely on that argument, but we're

6  responding to Your Honor's question.  There is actually a

7  provision in the order that states that any party producing or

8  disclosing personal health information or personal educational

9  information, as defined, that that will be designated as solely

10  confidential.

11      **THE COURT:**  All right.

12      **MS. HAZAM:**  So addressing Your Honor's point, there is

13  an unevenness that we perceive here.  We have other arguments

14  that we would like to present when appropriate, but I want

15  Ms. Miyata to build a complete --

16      **THE COURT:**  Let me just say, I'm not that convinced by

17  the evenness of the burdens because, by nature of different

18  parties to different cases, you're going to have different --

19  different levels of applicability of different parts of the

20  protective order to different people.  That doesn't -- that

21  doesn't mean you don't enter the protective order.

22      So what's your next argument?

23      **MS. MIYATA:**  Your Honor, we would pass the mic to the

24  private plaintiffs at this point.

25      **THE COURT:**  Right.

1           **MS. HAZAM:**  Thank you.  Lexi Hazam for plaintiffs.

2      And, Your Honor, we understand your inclinations in this

3   regard.  Don't want to belabor the point.  We also want to

4   indicate that we have studied, Your Honor, a recent ruling in

5   the *Doe v. Kaiser* case, which I think reflected some of what

6   Your Honor shared with us today.  We do believe that there are

7   several key points that distinguish this case from that one

8   that I would like to bring to the Court's attention.

9           First, one defendant here, Defendant Snap, does not seek

10  the provisions sought by the other defendants that is reflected

11  in Provision 7.6 of our order and, in fact, seeks the same

12  language sought by the plaintiffs here, which is also derived

13  from the model trade secret order in the Northern District of

14  California.

15          It is simply an alternative to it, indicated in Footnote 7

16  to Provision 7.2 of that order.  And under that alternative,

17  which would be considered presumptively valid in the same

18  manner that the 7.2 provision would be, no disclosure of the

19  expert is required unless the expert is a current officer,

20  director, or employee of a competitor or anticipated to become

21  one.

22          That is, the provision sought by both plaintiffs and

23  Defendant Snap in this case -- and, again, would be considered

24  presumptively valid such that a party seeking a departure from

25  it would have a burden to meet in order to have that departure.

1    And, in fact, because the language that plaintiffs and

2    Defendant Snap are seeking here is in the model order, we

3    believe that defendants have the burden of showing specific

4    prejudice or harm that would result if the alternative language

5    proposed by plaintiffs and Defendant Snap were not adopted.

6         We also would note, as has Ms. Miyata, so I will state

7    this very briefly, that defendant Meta, to date, has been

8    operating under an agreement with the states without any such

9    provision, with the states able to share the documents that

10   Meta designated as confidential with their expert without any

11   obligation to disclose those experts to Meta or without Meta

12   having the right to object.  And we agree with Ms. Miyata that

13   that could be disruptive.  It could also be disruptive to

14   sharing of experts with the states.

15        We also want to note that we have carved out source code

16   for separate treatment in this order, so to the extent that

17   source code warrants heightened protection and plaintiffs do

18   not dispute that, we are willing to have a protective order

19   that grants that protection to source code without granting it

20   to other things like business plans or marketing plans that we

21   anticipate defendants may so designate here.

22        And finally, we do believe that coordination with the JCCP

23   is very important in this context.  We believe it would be

24   burdened and impeded by the entry of Provision 7.2 from the

25   Model Order 7.6 here because Judge Kuhl has expressed her view

1   that California law does not allow for requiring the option of

2   non-testifying experts.

3       And she, in fact, stated that early disclosure of experts

4   would be an issue also.

5       We do believe that this issue will be raised again in the

6   JCCP by the plaintiffs there, and could result in plaintiffs

7   being in the untenable position of the JCCP plaintiffs either

8   having to disclose experts early or disclose experts who they

9   would never otherwise have to disclose, in contravention of

10   California law, or the parties not being able to coordinate

11   experts for efficiency purposes as both courts have urged in

12   this case.

13       So all of the above distinguished this case from

14   Your Honor's recent opinion in *Doe v. Kaiser*.  We believe that

15   the prejudice that I just explained through those factors

16   should be weighed against the defendants' claimed need for

17   these disclosures to avoid a substantial risk of competitive

18   harm.

19       We think that risk from the entry of the alternative

20   footnote language of the model order, versus the actual body

21   language, is vanishingly small here.  Obviously, Snap did not

22   perceive it; Meta has not, to date, either.  It doesn't come

23   from source code, because that's not at issue.  It does not

24   apply to the plaintiffs who pose no competitive threat to the

25   defendants.

 1     In sum, we submit that the non-Snap defendants have not

 2  met their burden here of showing specific prejudice from the

 3  alternative language in the footnote of the model trade secret

 4  protective order, and cannot do so here, we believe that

 5  position amounts to saying that any litigation against a tech

 6  company must not only require the trade secret order, but must

 7  require one of two alternatives contemplated by it, regardless

 8  of the other circumstances that exist in the case, such as

 9  differences between the defendants, practices to date among the

10  litigants, whether source code is implicated, and the need for

11  effective coordination between courts.

12     **MS. SIMONSEN:**  Your Honor, Ashley Simonsen for the

13  Meta defendants.  I'll respond briefly.

14     On the Footnote 7 alternative language, of course, the

15  language that the defendants proposed comes from the -- and

16  that Judge -- Magistrate Judge Hixson ordered, comes from the

17  model protective order and is the default language that would

18  be used.  And for that reason, it was plaintiffs who bore the

19  burden to show that that provision should not be a part of the

20  protective order in this case.

21     I think, in addition, the attempt to shift the burden to

22  defendants is particularly not well taken at this juncture,

23  where this is essentially plaintiffs' third attempt to seek to

24  overrule the magistrate judge's initial ruling on this,

25  essentially seeking reconsideration where they would bear the

**PROCEEDINGS**

1    burden.

2        On the source code point, plaintiffs' are correct that we

3    have yet to negotiate that order, but there's plenty of

4    material that the defendants would produce as highly

5    confidential competitor material and, in fact, already have

6    that doesn't amount to source code but still risks competitive

7    harm if it were disclosed improperly.

8        And just to give one example, the heart of the plaintiffs'

9    case here is that the defendants' algorithms that determine the

10   content that is presented to users through things like feeds,

11   that the design of those algorithms is defective and, of

12   course, communications and strategies around how to design

13   those algorithms what goes into them is all going to be very

14   highly confidential trade secret protected information,

15   separate and apart from the source code.

16       **THE COURT:** Let me stop you there.

17       Plaintiffs' counsel mentioned a couple of examples of

18   material that they thought -- that they fear could be

19   designated as highly confidential and, therefore, subject to

20   all this.

21       Is it Meta's plan to designate business plans as highly

22   confidential?  Financial statements as highly confidential?

23       What -- he says -- and what were the other examples you

24   gave?  Those are the two that jumped out at me.

25       **MS. HAZAM:**  Marketing plans; discussions of internal

**PROCEEDINGS**

1  studies that have looked at the issues in case; mental health

2  harms to teens.  It would not be unusual, in our experience,

3  for all of these to be designated highly confidential.

4      **MS. SIMONSEN:**  Your Honor, it's hard for me to sort of

5  speak to that so abstractly.  I think we are taking a close

6  look at every document that we've produced with an eye toward

7  whether its broader disclosure would present a risk of

8  competitive harm.

9      There may be some marketing materials where that is the

10  case.  There may be financial materials where that is the case.

11  There may be discussions of internal research bearing on how we

12  design our platforms compared to other defendants that would

13  fall into that category as well.

14      I will say that the Meta defendants have made a

15  reproduction of the materials they initially produced in

16  January and have removed the highly confidential competitor

17  designation from many of those documents.  I don't have the

18  exact number.  But we have reduced the designation, and we do

19  take seriously our obligation not to over designate.

20      **THE COURT:**  And I just want to stress that I

21  appreciate that.  But, obviously, for any party producing

22  documents, I do advise you to be judicious on what level of

23  confidentiality you designate either side's documents.

24      Okay.  I don't know if Ms. Ehler is still on the line, or

25  somebody for Snap is still on the line.  Does this mean I

**PROCEEDINGS**

```
1   should enter a separate protective order provision specific to

2   Snap?

3          MR. BLAVIN:  Your Honor, Jonathan Blavin on behalf of

4   Snap.

5      No, that's not necessary.  I think the position that Snap

6   had taken with respect to the initial briefing and meet and

7   confers with plaintiffs' counsel and the other defendants

8   regarding the protective order was when this was in front of

9   Judge Hixson, I think.

10     Although the procedural posture -- as Your Honor indicated

11  before, sort of we're starting, again, from Step 1 -- I don't

12  think is part of the -- at least at the time the appeal to

13  Magistrate Judge Gonzalez Rogers that we were taking a formal

14  position with respect to this issue at this point in time.

15         THE COURT:  Okay.  So just so I'm clear, if I rule for

16  the defendants as a group or the plaintiffs as a group, then

17  everybody is okay with that, and I don't have to make any

18  specific special provision for Snap?

19         MR. BLAVIN:  Correct, Your Honor.

20         THE COURT:  Ms. Hazam?

21         MS. HAZAM:  That's Snap's position to take rather than

22  ours.  All I can do is note that, to date, their position has

23  differed from that of the other defendants.  But Mr. Blavin has

24  stated what their perspective is on this.

25         THE COURT:  Okay.  I appreciate it.
```

1          Go ahead.

2               MS. MIYATA:  Apologies, Your Honor.  Bianca Miyata for

3     the state plaintiffs.

4          While we do understand that Your Honor may rule for the

5     activities moving forward, we would ask for specific language

6     carving out activities that have happened up until this date

7     and disclosure.  And we would ask for a carve-out regarding

8     witnesses, expert witnesses, and consultants with whom we have

9     been working up until this date in terms of disclosure.

10              THE COURT:  Can you be a little more precise?  What

11    are you asking for?

12              MS. MIYATA:  We would ask for carve-out from the

13    disclosure requirement of 7.6 for expert witnesses and

14    consultants with whom we've engaged prior to entering this

15    litigation.

16              MS. SIMONSEN:  Your Honor, for -- I apologize.

17              THE COURT:  By definition, if you haven't engaged them

18    for this litigation, they're not experts on this litigation;

19    right?

20              MS. MIYATA:  With whom we have engaged under other

21    terms and continue to work in this litigation.

22              THE COURT:  Okay.

23              MS. SIMONSEN:  Your Honor, again, Ashley Simonsen for

24    the Meta defendants.

25         My response would be that we are now in litigation.  The

1   pre-litigation confidentiality agreement that we entered with

2   the state attorneys general contemplated that, if we went to

3   litigation, a protective order would govern how our

4   confidential materials are to be treated.

5       We are now in litigation.  To the extent the state

6   attorneys general wish to move forward and use the experts they

7   retained for purposes of the investigation for purposes of the

8   litigation, then they would need to comply with Section 7.6 of

9   the protective order and disclose to us the identities of their

10  experts.

11      **THE COURT:**  Okay.  Is that -- was a sample

12  confidentiality agreement in the record anywhere?  I don't

13  think I saw one.

14      **MS. MIYATA:**  Not at this time, Your Honor.

15      **THE COURT:**  Could somebody file as an exhibit, or

16  supplemental exhibit to the refiled motion, the confidentiality

17  exhibit?

18      And, Ms. Miyata, I'll give you half a page to tell me what

19  exact language you're asking -- because when you say, "We want

20  a carve-out," I'm not exactly sure what you're asking me for.

21  So give me your requested carve-out language, and I'll consider

22  it.

23      **MS. MIYATA:**  Understood.

24      **THE COURT:**  I'm not making any decision on it yet

25  until I see it.

1        Okay.  Anything else on the protective order?

2        MS. SIMONSEN:  Just to clarify, Your Honor -- Ashley

3   Simonsen for the Meta defendants.

4        We'll be glad to attach the confidentiality agreement to

5   our one-page submission on Monday.

6        THE COURT:  Okay.  Thank you.

7        Anything further on that issue?

8        MS. MIYATA:  Not from the state plaintiffs.

9        MS. HAZAM:  Not from the individual plaintiffs either.

10       THE COURT:  And I thank you for your arguments.

11       Okay.  So then next issue is the ESI order.  So let me

12   give you some guidance there.

13       I -- maybe because I'm just not the smartest person in the

14   room here, I found the parties' joint statement re: ESI

15   protocol, with all the attached different redlines and

16   competing redlines, to be much too confusing for my brain

17   because there were arguments, and then there were things in the

18   appendices, and there was stuff hidden in the redlines that we

19   couldn't figure out which competing language went to which

20   issue.  Right?

21       So here's what I want you all to do:

22       We've prepared -- this is just a sample.  I'm going to

23   hand out one for each side.

24       Ms. Fox, if you would, please.

25       To make things perfectly clear for the Court in terms of

 1   what the actual proposed language is and what the issues are,

 2   as I understand from the joint statement re: ESI protocol,

 3   which I think is -- I forget what that is -- that's

 4   Docket 352 -- there are upwards of, depending on how you count,

 5   either 13 separate issues, conceptually, disputes about the ESI

 6   order, and there could be upwards of 18 or 19, depending on

 7   whether you consider subissues to be separate issues.

 8        So first of all, that's too -- I don't feel like the

 9   parties have adequately met and conferred to narrow the

10   disputes such as things like:  Do we really need to produce

11   things in color or not?

12        I can't believe counsel of your experience haven't been

13   able to work out a reasonable accommodation on that.

14        Whether or not at this stage hyperlink documents need to

15   be produced or not before anything else have been produced?

16        Again, I can't -- it is disappointing that details like

17   that have not been worked out.

18        So I'm going to order the parties -- and specifically I

19   want both sides, if you're using external -- whoever your ESI

20   vendors are, the person in charge of your -- at your ESI vendor

21   for both sides to be part of the meet and confers because, in

22   my experience, when you get the two techie people involved, you

23   find out that some of the things you were disputing actually

24   aren't hard to do and aren't really a dispute.

25        So I want another attempt to meet and confer over the

**PROCEEDINGS**

1    next -- I'll give you until -- let me look at a calendar.

2        Let's say until December 29th.  Okay?  To do this meet and

3    confer and narrow the issues and try to work out.

4        To the extent there still remain disputed issues on the

5    ESI order, I don't want more briefing on them.  I think I've

6    got enough briefing.  What I want is a chart substantially in

7    the format that -- of the example we've handed out.  And the

8    chart has sections.  All right?

9        At the top of each subsection is a non-argumentative, no

10    more than five- or six-word description of what the -- what the

11    dispute is.  Right?

12        So, for example, whether or not color documents need to

13    be -- documents need to be produced in color, I just want an

14    agreed-upon, non-argumentative, objective statement what the

15    dispute is.

16        And then, on one column, I want every single piece of

17    proposed language from the plaintiffs that they think, if

18    adopted, address that issue, and every single piece of language

19    proposed by the defendants in the other column that they think

20    addresses that issue so that I know which part -- because the

21    redlines are all over the place.  I need to know which language

22    goes to which issue and what you think -- which language

23    addresses each issue; right?

24        And I'm going to limit you to your top 10 issues.

25    Hopefully, there will be less than that.  Because 20 or -- 19

1    or 20 subissues of that is -- it -- you've got to do a better

2    job at negotiating these things.  All right?

3        So, hopefully, it will be less than 10.  Hopefully, there

4    will be less than 10.  But I want this chart by January -- I'd

5    say January 12th, so -- give you about -- a couple of weeks to

6    do the meet and confer, and another couple of weeks to come up

7    with the chart.

8        If you can get it to me sooner, that's fine.  It's not a

9    due date.  It's a "no later than" date.  Okay?  If you can do

10   the meet and confer sooner, that's a "no later than" date as

11   well.  All right?

12       And once I've got the chart, I know exactly what the issue

13   is and, you know, what each side's proposed language is to

14   address that issue, and I -- you can expect my decision on it

15   to look something like the chart with, one side or the other

16   "accepted."  All right?  Or, perhaps, modified by my own

17   wording.

18       Yeah.  And then, again, I think I gave an example, five or

19   six words.  I'll give you seven words, non-argument -- no more

20   than seven words -- to describe what the issue is.  All right?

21       And no footnotes.  I don't want any argument buried in

22   this chart.  All I want is your proposed language lifted from

23   your respective redlines that you think goes to each issue.

24       Any questions on kind of the procedure how this is going

25   to get organized for decision?

1          **MR. AYERS:**  Chris Ayers on behalf of plaintiffs.

2       From plaintiffs, no questions.  We understand your

3  direction.  Thank you.

4          **MR. HALPERIN:**  None from defendants, Your Honor.

5       Greg Halperin for Meta on behalf of the defendants.

6       I do think it would be helpful, prior to that meet and

7  confer, if the parties exchanged what their top issues are so

8  that we can prepare respectively.  But I'm -- I suspect the

9  parties can work that out amongst themselves.

10         **THE COURT:**  I would hope you can.  So make that part

11  of the meet and confer process.  Make that orderly.  That's

12  good also.

13       Okay.  So, like I said, meet and confer by the 29th, and

14  then chart to me by the 12th.

15         **MR. LEWIS:**  Your Honor, if I may.  Chris Lewis on

16  behalf of the state defendants.

17       I don't anticipate that it would be a problem, but if

18  there's a need for a third column?

19         **THE COURT:**  So -- okay.  So do you think --

20         **MR. LEWIS:**  I don't think it would be a problem with

21  this particular issue, Your Honor, but if it arises --

22         **THE COURT:**  I'm going to encourage the plaintiffs and

23  the state plaintiffs to work together to come up with whatever

24  proposed language is going to mutually address each of the

25  issues.  Hopefully, less than 10.

 1       I'm not going to give you a third column, but if there is

 2  a serious difference of opinion between the individual

 3  plaintiffs and the governmental plaintiffs on proposed

 4  language, then you can separate it within the plaintiffs'

 5  column, right, for a particular issue.  Right?

 6            MR. LEWIS:  Understood, Your Honor.

 7            THE COURT:  But we'll know if -- if one side doesn't

 8  speak with a unified voice, that tends to send a signal to

 9  the Court as to the strength of particular arguments.  So I

10  would think hard about whether you actually need to have

11  separate language.

12            MR. LEWIS:  Understood, Your Honor.  Thank you.

13            MR. AYERS:  Your Honor, Chris Ayers on behalf of

14  plaintiffs.

15       If I may, there has been some -- on certain issues there

16  has been some updated information, and so that would be helpful

17  if Your Honor is not going to have any argument on them or

18  submitting on the papers if we might be able to have brief

19  supplemental papers.

20       So, for instance, Google Vault recently announced just

21  last week that as of December 8th, Google Vault now actually

22  will pull -- has the ability to pull linked documents, and will

23  do that automatically with its -- attached to the e-mails, and

24  so it has the technology and that capability moving forward.

25       That was information that wasn't available to us during

**PROCEEDINGS**

1  the briefing and may be very helpful to, Your Honor, when

2  deciding if, hopefully, we can resolve issues like hyperlinked

3  documents.  But if not, it might be helpful to Your Honor to

4  get an update as to some of these issues.

5          THE COURT:  Defendants?

6          MR. HALPERIN:  Your Honor, I don't know what the

7  specific issues are, other than hyperlinks.

8      I will note Google Vault applies to a very small subset of

9  documents.  Meta, for instance, does not use Gmail, and so

10 Google Vault is simply irrelevant as to Meta.

11     I don't believe there's a need for supplemental briefing.

12 I also heard Your Honor suggest that we should be focusing on

13 bigger-picture issues than hyperlinks right now, and so I'm not

14 sure that there's a need for supplemental briefing on that or

15 any other issues at this time.

16         THE COURT:  Yeah.  I'm -- my strong suggestion is that

17 you try to resolve those kinds of issues in either reaching

18 negotiated language, or proposing language that may be

19 agreeable to that specific subset of technology.  I don't think

20 I need more briefing on that issue.  If it's important enough

21 to include in your proposed language -- or if it becomes agreed

22 upon, that's fine.  But if it's disputed proposed language, it

23 will be apparent to me, from the chart, what the issue is.

24         MR. AYERS:  Thank you, Your Honor.

25         THE COURT:  Without prejudice to my asking for more

 1  briefing later, after I see the chart as well; that's always my

 2  prerogative.

 3      Okay.  Anything else on the ESI order and how we're going

 4  to get that resolved, hopefully, sooner rather than later?

 5          MR. HALPERIN:  None from defendants, Your Honor.

 6          MR. AYERS:  Nothing from plaintiffs, Your Honor.

 7      Chris Ayers.

 8          THE COURT:  I just want to confirm then.  My

 9  understanding is their issues are withdrawn or certainly

10  there's no Court action needed on the redesignation issue, the

11  coordination order and -- at least those two.

12      Are there any other -- and then in the CMC, updated CMC

13  statement to Judge Gonzalez Rogers, there was reference to

14  ongoing negotiations, I think, between the states' counsel and

15  the defendants about protection of communications --

16  coordination communications.  There was something to that

17  effect.

18      Is that done or is that --

19          MS. SIMONSEN:  Excuse me, Your Honor.  Ashley Simonsen

20  for the defendants.

21      I believe, that was part of the coordination order

22  disputes that are now resolved.

23      I did want to clarify one thing relating to the

24  designation issue, just to correct something I said earlier --

25  which is, Meta has made a reproduction refresh of documents

1   previously produced to the state AGs that have been designated

2   under the protective order, and we have produced documents that

3   are not highly confidential.  We will be making a refreshed

4   production of our January production with those designations in

5   the near future.

6           **THE COURT:**  Okay.

7           **MS. MIYATA:**  Bianca Miyata for the state plaintiffs.

8     From the state plaintiffs' perspective, that issue isn't

9   resolved, and we intend to continue seeking to meet and confer

10   about it with the defendants and, hopefully, come with a

11   proposal for the next discovery conference.

12           **THE COURT:**  Okay.  So brewing but not ripe as far as

13   from my point of view.

14           **MR. WARREN:**  Your Honor, sorry.  Previn Warren for the

15   plaintiffs.

16     Just to clarify on the redesignation issue, the dispute

17   had just been over the timing of when defendants would submit

18   those redesignations.  I think that's resolved.  However, we

19   are going to take a very careful look at what designations they

20   do apply to those documents, and there may be disputes to bring

21   to Your Honor about that.

22           **THE COURT:**  You have my guidance on that.  Counsel for

23   the defendants should understand they should not be

24   over-designating just as a default, but --

25           **MS. SIMONSEN:**  Understood, Your Honor.

 1          **THE COURT:**  -- that's a danger here for everyone.

 2      Okay.  Let's see.

 3                      (Pause in proceedings.)

 4          **THE COURT:**  In my discussions with Judge Kuhl, my

 5      understanding is there was at least some discussion before her

 6      about doing some early depositions on -- before actual

 7      production of documents starts on identifying, in a staged

 8      discovery way, kind of how the documents are stored and where

 9      they're stored or something like that.

10      Am I describing that correctly?

11          **MS. SIMONSEN:**  Yes, you're right, Your Honor.

12      Ashley Simonsen for the defendants.

13      Judge Kuhl had ordered plaintiffs to serve a draft PMQ

14      notice on the defendants pertaining to topics relating to

15      things like the storage of and data systems regarding relevant

16      data.

17          **THE COURT:**  And so there's -- I take it there's

18      nothing for -- there's no dispute yet on that.  It's just some

19      process you're going through; is that right?

20          **MS. HAZAM:**  Your Honor, Lexi Hazam for plaintiffs.

21      I don't believe there's a dispute.  Judge Kuhl, I believe,

22      understood that liability discovery, including such

23      depositions, would be moving into this court for handling.  She

24      did express her views that certain depositions, certain kinds

25      of depositions should be prioritized.  Among them, some -- what

1    had been PMQ, person most qualified, notices in the JCCP

2    court -- one issue, just to flag something that could bubble up

3    to Your Honor, that we will want to address with the defendants

4    is whether there are any limitations on the number of 30(b)(6)

5    notices that could be propounded here.

6        Plaintiffs certainly don't think it makes sense for us to

7    try to do one now that covers every possible topic that could

8    arise in this litigation.  But we're happy to meet and confer

9    with the other side about that.

10        **MS. SIMONSEN:**  Your Honor, we're glad to discuss, more

11   broadly, a deposition protocol with the plaintiffs which we

12   think is important to negotiate in these cases and to cover

13   issues like that.

14        **THE COURT:**  Exactly why, at the top, I ordered you to

15   come up with a discovery plan, so --

16        **MS. SIMONSEN:**  Thank you, Your Honor.

17        **THE COURT:**  -- that's good.

18        Do you plan to take those depositions technically as PMK

19   depos in the JCCP, or would you take them as 30(b)(6)s in this

20   action?

21        **MS. HAZAM:**  Your Honor, I believe that plaintiffs

22   anticipate noticing them as 30(b)(6) depositions in this

23   action.  There may be some cross-noticing with the JCCP.

24        **THE COURT:**  Okay.  Given Judge Kuhl's indications and

25   certainly this Court's indication, certainly I think because

1  the philosophy is discovery should be used across all the

2  actions where it's applicable, since it's -- since I'm going to

3  be your discovery judge, essentially, I prefer you notice and

4  do your paper procedurally, do your discovery under the Federal

5  Rules.  That way, we all know what we're -- we're all shooting

6  under the same rubric of law.

7         **MS. SIMONSEN:**  And, Your Honor, just to clarify

8  something, at the last CMC before Judge Kuhl, she indicated

9  that, although she had ordered plaintiffs to serve a draft PMQ

10  notice, that that was effectively withdrawn, given that this

11  Court would now be presiding over discovery.  And so we don't

12  currently have proposed 30(b)(6) deposition topics from these

13  plaintiffs.  We're happy to meet and confer with them to the

14  extent they wish to serve a draft for us to discuss.

15         **MS. HAZAM:**  We are happy as plaintiffs -- Lexi

16  Hazam -- to serve those notices here and then meet and confer

17  with regards to them.

18         **THE COURT:**  I'm happy to hear both sides are happy to

19  work together.

20                      (Laughter.)

21         **THE COURT:**  Okay.  My understanding is Judge Kuhl --

22  she -- unlike Judge Gonzalez Rogers, she's kind of setting her

23  status conferences at the end of each preceding conference, and

24  kind of doing them kind of, not seriatim, but on -- as an

25  as-needed basis; although, they end up being kind of fairly

**PROCEEDINGS**

1    regular.

2       If the parties know that something is going to be

3    discussed in front of Judge Kuhl that will impact discovery

4    here, I'd like to get a heads-up on that in the monthly report

5    just before that happens just, so this Court can either

6    coordinate with her directly or figure out a way to listen in

7    or get the materials from the docket there.

8          **MS. HAZAM:**  Your Honor, Lexi Hazam for plaintiffs.

9       We appreciate that and are happy to accommodate it.  There

10   is a JCCP hearing, I believe, scheduled for January 14th, and

11   one of the issues that will arise there is the defendant fact

12   sheet, as the parties referred to earlier.  I believe that the

13   dispute is submitted to the Court by January 9th.

14         **THE COURT:**  Okay.

15         **MS. SIMONSEN:**  And that's my understanding as well,

16   Your Honor.

17      I did want to clarify that Judge Kuhl asked the parties in

18   their next CMC statement to propose dates for further status

19   conferences, so I think we will have some dates further out on

20   the calendar, just for Your Honor's awareness.

21         **THE COURT:**  Good.  So that leads to followup on a

22   comment I made earlier.  It is -- other than spending money,

23   it's harder for us, here, to access to court docket in the JCCP

24   matter.  I was curious.  Are the parties aware of any

25   publicly-maintained repository of filings from the JCCP that

1   doesn't cost the Court money to access, that's simply mirroring

2   what's happening?

3       Because I know sometimes in cases that have some either

4   media interest or public interest, somebody -- sometimes a news

5   outlet -- somebody essentially mirrors the court docket with

6   filings.  And I was just wondering if there is anything like

7   that out there.

8           **MR. CHAPUT:**  Your Honor, Isaac Chaput for the Meta

9   defendants.

10      The parties are utilizing the Case Anywhere system for

11  that purpose.  And I'm sure that we could work out a way for

12  Your Honor to get access to that system as well, and that

13  includes the full docket in the JCCP matter.

14          **THE COURT:**  That would be greatly appreciated.  Okay.

15                  (Pause in proceedings.)

16          **MS. SIMONSEN:**  Your Honor, Ashley Simonsen for the

17  defendants.

18      Would it be helpful for us to file Judge Kuhl's minute

19  orders on this docket, just a notice of her minute orders, just

20  so you have them in one place?

21          **THE COURT:**  That would be helpful.

22          **MS. SIMONSEN:**  Okay.  We'll be glad to do that.

23          **THE COURT:**  And just for the record, I think it's

24  already on the docket, but our next discovery management

25  conference will be January 25th, 2024, at 1:00 p.m., in this

 1  courtroom.

 2      The one after that is February 22.  That will be at 2:00

 3  p.m., because I'm on criminal duty in February, so I'll have to

 4  do it later.

 5      And then March 21st will be the next one that I've

 6  scheduled.

 7      Ah, I had -- in the -- on Docket 352, the ESI protocol

 8  joint statement -- I don't know who could answer this.

 9      At page 4, Footnote 6, is citation to a case called "*East

10  Palestine Train Derailment*," Number 4:23-CV-00242, Eastern

11  District of Ohio, 2023.

12      The Court has been unable to -- well, there is no Eastern

13  District of Ohio.  So when looking at the Northern District of

14  Ohio, Case Number 23-2242, there is a Social Security case.

15  And looking at the Southern District of Ohio, Case Number

16  23-2242, there is a personal injury pharmaceutical case.

17      So, I guess, does anybody know what the correct citation

18  is to that case so we can look at it?

19      **MR. AYERS:**  I can get it for you momentarily, Your

20  Honor.

21      This is Chris Ayers.

22      I'll look it up.

23      **MS. HAZAM:**  Your Honor, Lexi Hazam for plaintiffs.

24      While Mr. Ayers gets that cite for you, I did want to

25  alert you.  I was just reminded of this by one of my JCCP

1  colleagues during the hearing that there is the intent to also

2  have, in addition to the Case Anywhere system, a website

3  through one of our vendors for this case who will be hosting

4  plaintiff fact sheet data and defendant fact sheet data.

5      It's a company called BrownGreer.  There is an intent to

6  have a website that will also have case management conference

7  statements transcripts from hearings in both jurisdictions.

8      So once that is ready to go, we can also provide

9  Your Honor with access to that.

10         **THE COURT:**  That would be greatly appreciated also.

11         **MR. AYERS:**  Chris Ayers on behalf of plaintiffs.

12      Apologies, Your Honor, for the typo with respect to the

13  case.  The case is *In Re: East Palestine Train Derailment*, and

14  that's Case Number 4:23-CV-242.

15         **THE COURT:**  242.  Okay.

16         **MR. AYERS:**  242.  And that's in the Northern District

17  of Ohio.

18         **THE COURT:**  Thank you for that.  Okay.

19         **MR. AYERS:**  We have a copy if you want it.

20         **THE COURT:**  No, I can get that, now that I've got the

21  cite.

22         **MR. AYERS:**  Thank you very much.

23         **THE COURT:**  Thank you.

24      Right.  Again, this is -- since discovery started, but

25  this is an MDL and it's a different nature case, I haven't seen

1    any indication -- what are the parties' views or whether any

2    kinds of initial disclosures need to be done, or if you've done

3    any?  I don't think you have.

4         **MS. SIMONSEN:**  Your Honor is correct.

5         Ashley Simonsen for the Meta defendants.

6         We haven't done initial disclosures.  We have had

7    extensive disclosures about things like document storage and

8    data systems in the course of negotiating the preservation

9    order.

10        I think we'll have to go back and discuss it as a group.

11   I wouldn't want to misrepresent the defendants' position on

12   whether such disclosures would make sense at this juncture in

13   the context of these proceedings.

14        **THE COURT:**  Ms. Hazam?

15        **MS. HAZAM:**  Your Honor, Lexi Hazam for plaintiffs.

16        I agree that I believe it would be appropriate for the

17   parties to meet and confer on this topic as part of the

18   discovery plan that Your Honor referred to earlier.  It may be

19   that, at least, some forms of initial disclosures are

20   appropriate here.

21        Other aspects of what are typically initial disclosures

22   could be part of the parties' discussions with regards to ESI

23   custodians, you know, et cetera, sources of documents.  So

24   there may be different ways of getting to the same thing here,

25   but we certainly want to have that discussion.

1    **THE COURT:** Okay. Thank you for that and just keep me

2    apprised in your status reports on those discussions, because

3    as I -- my recollection of the rule is, if I'm going to exempt

4    you from -- the rule is self-activating, so if you're not going

5    to follow the letter of initial disclosures, I need to issue an

6    order to exempt you from it or modify that in some way. So

7    once you reach resolution on that, just let me know.

8    Okay. This is more of a general rule in this court which

9    is choosing an ADR option. As you know, there are multiple

10   options for ADR in this court, and I don't recall if the

11   parties talked about choosing a particular one. You may have.

12   So let me ask that.

13   Have you already agreed that -- some chosen form of ADR?

14   **MR. WARREN:** Yes, Your Honor.

15   This is Previn Warren for the plaintiffs.

16   The parties have selected a settlement master that was

17   mutually agreed on, and we have yet to file an order -- a

18   proposed order to that effect with the Court, but we can work

19   on doing that.

20   **THE COURT:** Will that have an ADR deadline as well?

21   **MR. WARREN:** I'm sorry, Your Honor?

22   **THE COURT:** Will that have a deadline to, at least,

23   start or finish ADR?

24   **MR. WARREN:** I don't believe so. And I was just

25   corrected by my colleague that the settlement master was

 1   actually appointed by the Court, so that's already there.

 2        THE COURT:  Getting a little bit out of my bailiwick

 3   of discovery, but the scheduling could -- sometimes scheduling

 4   of ADR sometimes impacts discovery.  So you may want to discuss

 5   with Judge Gonzalez Rogers whether she's going to impose a

 6   deadline to, at least, start or finish ADR in the case because

 7   that, again, can impact how things get scheduled here.

 8        And if that happens, let me know, and we'll talk about it,

 9   how it does impact things.

10        Okay.  I've covered everything on my agenda and everything

11   on your agenda, I think.

12        Is there anything else either side wants to raise?

13        MR. WARREN:  Not for plaintiffs, Your Honor.

14        MS. SIMONSEN:  Nothing for the defendants.  Thank you,

15   Your Honor.

16        THE COURT:  Thank you all for -- my apologies to the

17   court reporter for a long hearing without a break.

18        But thank you all for this.  I look forward to seeing you

19   next month and seeing your submissions.  Before that, obviously

20   for those of you who are traveling, safe travels, and have

21   happy holidays, and we'll see you in the next year.

22        ALL:  Thank you, Your Honor.

23        THE CLERK:  Court is in recess.

24             (Proceedings adjourned at 2:31 p.m.)

25                       ---o0o---

1

2                         __CERTIFICATE OF REPORTER__

3            I certify that the foregoing is a correct transcript

4      from the record of proceedings in the above-entitled matter.

5

6      DATE:    Wednesday, December 20, 2023

7

8

9

10      _____

11          Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
                  Official Reporter, U.S. District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25